[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action was tried as a limited contested case; the parties having reached agreement on the joint custody of their minor son, Lance Scott Stewart, born April 17, 1979, with visitation orders, as described hereinafter. CT Page 4377
The plaintiff wife's complaint was returnable to this court on October 30, 1990, and the defendant husband filed an answer and cross complaint. Each alleges that their marriage has broken down irretrievably. The court received evidence and finds as follows:
The wife by the name of Kathleen Madeiros married the husband Lance Stewart on November 18, 1971, at New Bedford, Massachusetts. They have two children, both of whom are issue of the marriage, Brent A. Stewart, born June 6, 1974, who has reached his majority, and Lance Scott Stewart (hereinafter Scott) born April 17, 1979. Both Brent and Scott, the parties' minor child, reside with the wife. No other minor children were born to the wife during the marriage.
Both parties have resided continuously within the state of Connecticut for at least twelve months next preceding the date of the filing of the plaintiff's complaint, all statutory stays have expired, and the court therefore has jurisdiction.
The wife who was born September 18, 1946, is a high school graduate with one year of college. She has possessed a real estate agent's license for approximately six years and now works as a real estate agent. She had previously worked as a bookkeeper. In the years 1990 and 1991, she earned a gross of approximately $8,500 annually, and in 1992, a gross of $17,800, which included: a $7,800 commission from a single transaction which the wife characterized as a "once in a lifetime" sale. She also grossed $15,244, $5,801 and $25,000 in 1989, 1988 and 1987 respectively. In prior years, most of time was devoted to homemaking, acting as the primary caretaker for both sons, and nursing Brent, who was born with severe medical problems. He was subjected to a large number of surgical interventions, including surgeries on his urinary and intestinal tracts, and a colostomy, during his early childhood. As a result, Brent required almost continuous care and attention during the first eight years of his life. Brent still has health problems.
The wife also has a number of health problems which include an intermittent mitral valve prolapse, an enlarged thyroid tumor and a fibroid in her uterus; the latter may need surgical removal. CT Page 4378
From time to time, she experiences dizziness, fatigue and short-term memory loss, but at present, is still able to perform her household duties and work full-time at her real estate job.
The husband was born March 24, 1943, graduated from high school, obtained a bachelor's degree from Tufts University, and his master's degree and doctorate from the University of Connecticut in marine biology. He began working at the University of Connecticut in 1966 as a graduate assistant and since 1971 has been on its faculty. He now serves as an Associate Professor and is Science Director of its National Undersea Research program. His duties include some teaching responsibilities and ocean research, and have taken him away from home on numerous sea-going trips for a week or two at a time over the years.
He also acted as a marine consultant for Ebasco and earned $6,714 in 1990, and is a lessee of several oyster ground leases with the state of Connecticut, Department of agriculture, each of which is for a five-year term and is essentially automatically renewable. For the five years from 1987 to 1991 inclusive, he has grossed sums ranging from $2,800 to $11,320, with nets varying from losses of $410 in 1988 to a profit of $4,455 in 1990. If depreciation is added back in, the husband has enjoyed a positive cash flow from his summer shellfishing or aquaculture operations in each of these years. He generated no income in the years 1991 and 1992 from any of his business activities outside of his University of Connecticut employment, from which he now earns $61,400 per year. He continues to pay the rentals to the state of Connecticut of approximately $1,200 per year in the aggregate for all of the oyster ground leases.
The wife, who filed a complaint for dissolution of the marriage in 1982, claimed then, and now, that the cause of the breakdown of the parties' marriage was the husband's almost daily excessive drinking and his resultant verbal belligerence toward her. In 1982, the husband voluntarily left the family home for several months, the parties reconciled, and the action was withdrawn. The wife claims that a few months later, the husband recommenced his previous drinking habits, and his verbal threats and insults to her, which continued to the time she obtained a restraining order CT Page 4379 in 1991 forcing him out of the home. The restraining order was based in large part on her claim that he punched her in the arm leaving a black-and-blue mark. The wife was also in fear of the husband because of the large number of firearms owned by him.
In any event, the court file is peppered with a large number of contempt motions brought by the wife, and on one occasion, the husband was arrested for being on the premises, and was ultimately also found to be in contempt as a result of the same incident. The criminal charge was nolled, and the husband was found to be in contempt on one occasion.
The husband, on the other hand, claims that he drinks only moderately and never threatened or struck his wife. He further asserted that his wife shut him out of her life, spent her leisure time with her friends, and refused to attend professional functions with him, including one in 1990 at which he was named "diver of the year." The wife's father corroborated the wife's testimony as to husband's drinking habits. The husband called a number of witnesses, including social friends and professional colleagues who esteem him both personally and professionally, all of whom essentially testified that they never saw him drink alcohol beyond moderation.
On the state of this evidence, when examined in the light of the record as a whole, and with the background of an over-twenty-year marriage, the court concludes that both parties equally share the responsibility for the breakdown of their marriage, and the court cannot assign more of the fault to either party. However, the mutual hostility and intransigence exhibited by the parties is tangibly evident, and it is clear that the marriage has broken down irretrievably, and the court so finds.
The parties vigorously litigated the values of various properties owned by them, claiming dramatic differences in the values of the family home in Stonington, the vacant acreage across the street and the unimproved acreage in Coventry which the husband recently received through his parents for no consideration. They also were at issue on the value of the husband's boats, his shellfishing leases, and on the ownership of a boat, Lancer II, whose CT Page 4380 legal title is in the name of husband's father, and on which the husband lives.
The court finds the following relevant facts in respect to the valuations of the parties' assets.
The family dwelling, 267 Denison Hill, North Stonington, is an old colonial farmhouse-type dwelling, circa 1700, of about 1,500 square feet, situated on approximately 18 acres of land in a bucolic section of North Stonington. On the parcel are several outbuildings, including a barn and chicken coop, stonewalls, flower and vegetable gardens, a fruit tree orchard, and provisions for farm animals. The dwelling itself consists of six rooms, including three bedrooms and one bath. When the parties jointly purchased the properties in 1975 for approximately $35,000 including closing costs, the house and the outbuildings were in a dilapidated condition. Despite major repair and renovations done by the husband to the buildings and to the grounds and to a lesser extent by the wife, the home still remains unfinished. The wife's appraiser opined that the fair market value of the dwelling was $150,000.
The unimproved land across the street consists of 5.17 acres and has a shed in disrepair. It is capable of division into two lots and was valued by the wife's appraiser at $42,000, but if sold together as a single property with the home and land, according to him, would be worth $170,000. On cross-examination, he conceded that the highest and best use of the property was as two parcels, and hence had a combined value of $192,000. The husband, in his affidavit, placed a combined value on the properties of $250,000. The town assessed the home at $123,200 and the 5.17 acre parcel at $8,540, which are 70 percent of fair market value. Numerous photographs of the home and environs were introduced into evidence.
Another major asset was a 42 acre, irregularly shaped, unimproved parcel of land in the Town of Coventry, with 300 feet frontage on a town road. It was acquired by the husband from his father and by way of his deceased mother's estate in 1990 for no consideration. The Town of Coventry assessed it at $117,800 or 70 percent of a fair market value of $167,800, considering it to comprise a house lot, a second house lot and rear land. Switz, the wife's CT Page 4381 appraiser, testified that the property was worth $195,000; the husband's appraiser, $87,500.
"The determination of the value of. . .property is a matter for the trial court. The trier may accept or reject the testimony of an expert, offered by one party or the other, in whole or in part. . . It is the sole province of the trial court to weigh and interpret the evidence before it and to pass on the credibility of the witnesses." Sunbury v. Sunbury, 13 Conn. App. 651, 660, rev'd on other grounds,210 Conn. 170 (1989). A variety of factors may be considered by the trial court in assessing the value of property. "The trier arrives at his own conclusions by weighing the opinions of the appraisers, the claims of the parties, and his own general knowledge of the elements going to establish value . . ." Ratney v. Willametz, 9 Conn. App. 565, 584, cert. den. 201 Conn. 805 (1986).
With these general principles in mind the court finds that the value of the dwelling, the outbuildings and 18-acre parcel is $170,000; the 5.17 acre parcel across the street may be divided into two buildable house lots without substantial expense and is hence worth at least $60,000. The court further finds that the Coventry property is capable of division into at least two house lots, one or both of which would have additional rear land, considering the frontage requirement of 150 feet per lot, or three house lots, including a rear lot, with some effort in the prosecution of a zoning application. In either case, the court concludes that the Coventry property has a value of $110,000. The court also finds that the wife made no contributions of any value toward the Coventry parcel. Indeed, her advice to the defendant had the effect of increasing his property tax burden.
An additional major asset disclosed on the parties' affidavits was the husband's retirement plan with the State of Connecticut which would entitle him to receive $2,513 per month at a retirement age of 55. The court finds that the husband has 26 years of continuous credited employment with the state and therefore has a vested right to receive benefits upon his retirement at either age 55 or 65 at his option. The court credits the testimony of the pension expert Marcuse, whose qualifications were stipulated to by the parties, that the benefits provided by the plan have a CT Page 4382 present value of $241,346.
Other significant assets of the parties disclosed on their financial affidavits are four boats and three trailers in husband's name, used at various times in his shellfishing operations, which the court finds, applying the principles previously mentioned, based on the testimony are worth $10,000 in the aggregate and the oyster ground leases and husband's shellfishing operations are worth $5,000.
The wife also argues that the large boat, the Lancer II, upon which the husband now resides, at least equitably belongs to husband, and should be considered in fashioning financial awards, although legal title to it remains in his father. The wife points out that the husband has had unrestricted use of it, pays for taxes, mooring and dockage fees and its other expenses and has paid for substantial repairs and renovations for it, including $5,000 for the Owens boat, which husband cannibalized for the Lancer II. The wife values the Lancer II at $8,000.
The extent of availability and usage of the boat by the husband and his dominion and control over it, when considered together with the expenses he has incurred over the past five years for its repair, upkeep and maintenance, leads the court to agree that the husband's interest in the boat is almost tantamount to ownership of it, and the court has considered its status in relation to the husband in making the awards set forth herein. The court finds that the Owens boat has no value.
In making the orders stated, the court has considered all of the statutory factors set forth in General Statutes 46b-81(c) and 46b-82. The court has also considered and accorded value to those non-monetary contributions of the wife including homemaking and child care which enabled the husband to devote substantial effort to his employment and avocations, which in turn enhanced his professional expertise and skills and enabled the family to acquire tangible and substantial marital assets. See O'Neill v. O'Neill, 13 Conn. App. 300, 311, cert. den. 207 Conn. 806
(1988).
The court must consider all of the statutory criteria in determining how to divide the parties' property CT Page 4383 in a dissolution action. Leo v. Leo, 197 Conn. 1, 5 (1985). A trial court, however, need not give each factor equal weight; Kane v. Parry, 24 Conn. App. 307, 313-314 (1991); or make express findings as to each statutory factor. See Savage v. Savage, 25 Conn. App. 693, 701 (1991).
The court has also considered that the purpose of alimony is to meet one's continuing duty of support; Wood v. Wood, 165 Conn. 777 (1974) and the purpose of property division is to unscramble the ownership of property, giving to each spouse what is equitably his. Beede v. Beede,186 Conn. 191, 195 (1982).
The court also has considered the vastly superior earning capacity and present earnings of the husband, when compared to that of the wife, her need to parent the parties minor child, who also has psychological problems, and the needs of the older son, who both as noted, now reside with the mother. The court also has considered that the husband's shellfishing and aquaculture expertise, his ability to earn consultant fees, his vocational and avocational skills and education and the security provided to him by his pension and retirement benefits, clearly show that his resources and capacities are greater than those of the wife to acquire capital assets and income in the future.
The court also concludes that, in the light of the length of the marriage and the ages and health of the parties, this disparity in present income and earning capacity justifies an award of alimony as later set forth.
The court has previously overruled the husband's argument with respect to the admissibility into evidence of the present value of his retirement plan, and it is unnecessary to reiterate the basis for its ruling already stated on the record. The court notes in this regard the husband's suggestion in his brief that the husband be ordered to pay 20 percent of his net pension payments to the wife until her remarriage, and to maintain her as a survivor beneficiary thereon until either party remarries. The court also considers husband's testimony in this regard that the wife be accorded an equitable share of his retirement benefits. The court finds that the husband's retirement benefits are not a mere expectancy or a contingency which may never occur, within the meaning of Rubin v. Rubin, 204 Conn. 224
CT Page 4384 (1987); nor are they uncertain as to the amounts he would eventually receive as described in Eslami v. Eslami,218 Conn. 801 (1991); but rather are a form of deferred compensation for services rendered which is susceptible of reasonably accurate quantification as discussed in Thompson v. Thompson, 183 Conn. 96, 101 (1981). The Thompson court said, "The present value of a pension benefit may be arrived at by using generally accepted actuarial principles to discount for mortality, interest and the probability of the employee remaining with the employer until retirement age." Id. Here, Marcuse testified to these factors; additionally, it was evident that if the plaintiff left his state employment at this time, even if he never worked another day, he would be entitled to $2,513 per month beginning when he reached age 55, until his death. Hence, his pension or retirement plan benefits, or an interest therein, is a property interest transferable, under General Statutes46b-81.
Accordingly, the court enters orders as follows.
A decree of dissolution may enter on the ground of irretrievable breakdown of the marriage.
The parties are awarded joint legal custody of their minor child, Lance Scott Stewart, his primary residence to be with the wife. The husband shall have liberal rights of visitation to include: Wednesday evenings and alternate weekends from Friday night to Sunday night. The extent and manner of Scott's visitation with his father has been referred to the Family Relations Office of the Superior Court for mediation, study and recommendation, and the court retains jurisdiction of this issue.
The defendant father shall pay to the mother the sum of $210 per week by way of child support for Scott which is within the child support guidelines.
The defendant shall be entitled to claim the Internal Revenue Service dependent's exemption for Scott during the calendar year 1993 and thereafter. The wife shall cooperate with this claim.
The defendant shall maintain his present job-related health insurance coverage for the benefit of CT Page 4385 Scott and the parties shall share any uncovered, unreimbursed health expenses for Scott, two-thirds by husband, one-third by wife. A General Statutes 46b-84(c) order has previously entered.
The defendant shall pay to the plaintiff the sum of $125 per week as periodic alimony, which shall terminate upon the wife's remarriage, cohabitation or the death of either party, and upon the eligibility of the wife to begin to receive the retirement benefits later set forth; and said alimony shall not be otherwise modifiable as to term or amount. The child support and alimony orders shall be secured by an immediate wage execution.
The husband shall cooperate with wife's application to remain insured under his present employment-related health insurance coverage for the maximum statutory period allowed. Husband shall pay one-half the premium therefore as additional periodic alimony for a period of three years from the date, of this decree, which shall terminate sooner in the event of her death, cohabitation or remarriage.
Husband shall convey to wife, by quit claim deed, all his right, title and interest to the premises at 267 Denison Hill Road, North Stonington, and the 5.17 acre unimproved parcel across the street, subject to the first mortgage and any unpaid real estate taxes thereon, which the wife shall assume and pay and save husband harmless therefrom. Simultaneously, wife shall execute a promissory note secured by mortgage in favor of husband in the amount of $25,000. Said note and mortgage shall be due and payable with interest at the rate of four (4) percent per annum on the first to occur of the following events: wife's remarriage or cohabitation; her death; sale of either parcel; her ceasing to use the premises as her principal residence; or April 17, 1998.
The quit claim deed to wife shall contain a right of first refusal running to husband substantially as follows: In the event either or both parcels described herein are offered for sale and any bonafide purchaser agrees to purchase the same, in writing, the husband shall have thirty days from receipt of the proposed terms and conditions of such sale to accept the same, otherwise his right to purchase shall lapse. In any event, his right of first refusal shall CT Page 4386 terminate on April 17, 1998.
The husband shall transfer, by Qualified Domestic Relations Order (QDRO) a twenty (20) percent interest in and to his retirement benefit plan to wife, and he shall be survivor beneficiary of said twenty percent interest, and irrevocably designate her as survivor beneficiary of 50 percent of his remaining interest in the plan. Such latter designation shall terminate if she predeceases him. He is specifically ordered not to withdraw any funds from said plan, except for benefits paid to him in the ordinary course of retirement; he is further ordered not to otherwise impair said plan. The court retains jurisdiction to amend the QDRO to maintain conformity with the provisions of federal law relating to pension and retirement benefit.
The husband is further ordered to designate his wife as irrevocable beneficiary of his job-related life insurance policy in the face amount of $50,000, so long as he is obligated to pay her child support or alimony.
The wife shall take and have her IRA accounts of $5,000, the escrow account for the 1992 taxes in the amount of $2,000, the other small bank accounts shown in her name on her financial affidavits, her 1986 Dodge motor vehicle, the tangible personal property already agreed upon on Schedule A to Plaintiff's Exhibit U and Defendant's Exhibit 13, and as clarified in the attachment to defendant's claims for relief, together with the following items which remained disputed: the oval table, Ithaca shotgun, Vermont Castings woodstove, the ladder, the fireplace equipment, one-half of the garden tools, and the hutch. The husband shall have the remaining disputed items: the mandolin, the armoire, small maple table, one-half of the garden tools, the pair of sconces, a pine three-drawer bureau with black walnut trim, rototiller, the wood wheelbarrow, and the grandfather's produce scale, together with the other items set out to him as designated in Schedule A annexed to Plaintiff's Exhibit U, Defendant's Exhibit 13 and clarified in the attachments to defendant's claims for relief.
Defendant shall remove all of the items assigned to him prior to September 1, 1993, thereafter, plaintiff shall have no duty or obligation with respect to the same. Defendant shall be entitled to go upon the Denison Hill Road CT Page 4387 premises on three Saturdays from 9:00 a.m. to 6:00 p. m. to remove the items. The dates are to be designated by him by giving at least two weeks written notice to plaintiff. Except as above provided, defendant is ordered not to enter upon the premises.
The wife shall continue to hold the Chelsea Groton Savings account described in her financial affidavit for the benefit of Scott.
The obligations of the parties shall be allocated as follows:
Husband shall pay and save wife harmless from all of the liabilities shown on 3 of his financial affidavit, dated January 26, 1993, as follows: Union Trust Mastercard, $4,893; Peoples Bank Mastercard, $2,670; ATT Mastercard, $3,200; N.Y. Life loan, $1,295; Aetna loan TDA, $6,101; Pawcatuck Boating, $1,563; IRS 1991 tax liability, $3,723; Coventry real estate taxes, $1,024; and he shall pay one-half of the City Bank Visa of $4,338, the sum of $2,169. The wife shall pay all of the obligations shown on 3 of her February 26, 1993 financial affidavit including the Denison Hill Road, North Stonington, property taxes of $2,759; Switz, $800; Mastercard of $293 and $298; Visa of $344; Charter Oak Credit Union of $1,700; Mr. Medeiros of $9,675 and she shall pay one-half of the City Bank Visa of $4,338, the sum of $2,169, and save the husband harmless therefrom. The court does not credit the wife's claim of indebtedness to her father, Mr. Madeiros, as the court also finds that husband's parents made equivalent contributions to the family, and that, in any event, the wife is receiving the family home for which Mr. Madeiros' contribution was used. The court also finds it unlikely that this sum, if due, will ever be payable.
The husband shall take and have free of any claims of the wife, except as previously stated, the remainder of his retirement benefit plan; the Coventry property; all of his boats, trailers and fishing equipment; his oyster ground leases; his shellfishing aquaculture business; his Westerly Yacht Club membership; his Aetna TDA account; his New York Life Insurance policy; and the cash value thereof; his 1981 Jeep; his guns and tools; and the tangible personal property and mortgage note and deed previously described. CT Page 4388
The defendant husband shall make copies of the slides desired by the plaintiff and the parties shall equally share the cost. The issue of claimed arrearages of child support, alimony and unpaid health expenses shall survive the entry of judgment and be determined in the usual course.
In connection with the claim for attorneys' fees, the court must observe that the parties have vigorously and extensively litigated this matter since its return date of October 30, 1990. They have filed motions, participated in discovery, retained experts and taken depositions. They have incurred legal fees, in amounts which would tax the resources of even wealthy people. They have acted in a manner which has adversely affected the financial health of their family, the husband by not engaging in his aquaculture and consulting business and thereby foregoing the opportunity to obtain additional income in 1991 and 1992; the wife, by refusing to file joint federal income tax returns for the years 1990 through 1992. All of this went on while both of their children were suffering through severe personal crises. It is unfortunate that these efforts were not focused upon the best interests and welfare of their children instead of against each other.
In any event, the court sees no reason to depart from the general rule regarding counsel fees in Koizim v. Koizim, 181 Conn. 492, 501 (1980). The orders the court has entered have left both parties with the resources and financial ability to pay their own counsel fees. The court cannot find that the wife's obligation to pay her own counsel fees would undermine the purpose of the financial awards already entered. Suffice it to say that the court has considered the language of General Statutes 46b-62 in accordance with the parties' respective financial abilities and the criteria set forth in General Statutes 46b-82 and concludes that each party shall be permitted to pay their own counsel fees.
The court cannot say that the length and intensity of this litigation was solely the responsibility of the defendant, and this result is dictated by the respective financial abilities of the parties. See Koizim v. Koizim,
Teller, J. CT Page 4389