## CAROL A. SUNBURY *v.* DONALD C. SUNBURY
### (4914)

DUPONT, C. J., BIELUCH and NORCOTT, Js.

Argued October 7, 1987—decision released March 15, 1988

*Zbigniew S. Rozbicki,* for the appellant (plaintiff).

*Sherman M. Tonkonow,* for the appellee (defendant).

NORCOTT, J. The plaintiff wife appeals challenging the financial orders rendered by the trial court incident to the judgment dissolving the marriage between the parties. The plaintiff claims that the trial court erred (1) in denying her motion for arrest of judgment and a new trial, (2) in finding that the plaintiff bore a

greater percentage of fault for the breakdown of the marriage than did the defendant and in dividing the marital assets in accordance with that finding, (3) in ordering her to transfer to the defendant her interest in the marital residence, and (4) in finding that the proceeds of a particular annuity fund were not a joint asset of the marriage. We find error in part.

The plaintiff and the defendant were married on November 8, 1958. There were three children born of the marriage, the youngest of whom was eighteen years of age at the time judgment was rendered dissolving the marriage between the parties. The record reveals that the plaintiff was forty-eight years old and was in reasonably good health at the time of judgment. She is a registered nurse and has received advanced training in the field of oncology. Although she has been employed as a nurse for much of her adult life, she has no retirement benefits, pension plans, health insurance, or other associated benefits. At the time of trial, she was working at a convalescent home earning a gross of approximately $339 per week and a net of $274 per week. The only personal assets the plaintiff possessed were two cars that were registered in her name and $400 on deposit in a joint savings account with the defendant.

The defendant was forty-nine years old and had a high school education. For the previous seventeen years he had worked at Sears, Roebuck and Company. The defendant reported in his financial affidavit that he earned a gross of $718 per week but that after taxes, insurance, and contributions to an IRA account and a profit sharing plan he netted $342 per week. He had a profit sharing plan with Sears, Roebuck and Company in which he had invested $18,776. He also had a retirement plan with the company to which he had three years of service credited. The defendant owned one car and had a savings account that contained $30,000,

money that had recently been transferred to that account from an annuity held in the defendant's name. Before the money had been withdrawn, the annuity was valued at over $39,000. The plaintiff testified that the money in the annuity consisted of $20,000 that had come from the sale of property owned by the parties plus the interest that had accrued on that amount.

The principal asset of this marriage was the jointly held land and residence, a five room single family dwelling. In a financial affidavit given in May of 1985, the plaintiff indicated that the property was worth $75,000. Later, in a sworn financial affidavit dated November 22, 1985, the plaintiff indicated that the property was worth $89,500. At trial, an expert for the plaintiff testified that the property was worth from $89,000 to $90,000. The defendant testified that the property was worth $75,000. Both parties acknowledged that the property was encumbered by a mortgage of approximately $4400 at the time of trial.

The marriage between the parties was relatively stable until the death of the parties' oldest child in 1979. The record indicates that both parties suffered from emotional trauma as a result of their child's death. The trial court found that after the death of their child the plaintiff became increasingly hostile, especially with respect to the parties' second child. The plaintiff began to frequent drinking establishments, staying out until 1 a.m. She also developed a relationship with another man. The plaintiff claimed that the defendant often engaged in drunken behavior, had many illicit affairs with women, and physically abused her.

During the trial to the court on this matter, the judge called the parties into his chambers. There is no record of what was said in chambers. When the parties returned to the courtroom, no mention was made of what occurred in chambers.

After the close of the trial, the court rendered judgment, finding that the marriage had broken down irretrievably and that the plaintiff bore a greater percentage of fault for the breakdown than did the defendant. Pursuant to this finding, the court ordered the defendant to pay the plaintiff periodic alimony in the amount of $75 per week for a period of two years. The court also ordered the defendant to make a lump sum alimony payment of $35,000 to the plaintiff; such payment was due and payable two years from the date of the issuance of the order or upon the sale of the marital residence, whichever came first. The plaintiff was required to transfer her interest in the marital residence to the defendant. As an additional term, the court ordered the defendant to pay the plaintiff $1000 as an allowance for counsel fees.

Following the imposition of judgment, the plaintiff filed a motion for arrest of judgment and new trial alleging that the trial court had been prejudiced by information it received during the in-chambers conference held during trial. This motion was denied by the court.

I

The plaintiff's first claim is that the trial court erred in denying her motion for arrest of judgment and new trial. She argues that during the in-chambers conference a discussion was had concerning the merits of the underlying action as well as the settlement offers proposed by the parties. She argues that the trial judge, being privy to these matters, was unduly prejudiced and should have disqualified himself.

As our Supreme Court noted in *Krattenstein* v. *G. Fox & Co.*, 155 Conn. 609, 614, 236 A.2d 466 (1967), a judge should not become involved "in a chambers conference looking to the settlement of a case which he is about to try as a court and in which he will be called upon

to decide the issues of liability and damages . . . ." If a judge does sit or continues to sit on a case after becoming involved in a settlement discussion "[i]t is then impossible to avoid questions as to whether the judge can disregard, on the trial, matters disclosed in conference but unmentioned during the trial and whether a preliminary judgment, formed at the conference and predicated on unsubstantiated claims of proof, may have some subtle influence on a final judgment after a full hearing. It is inevitable that the basis is laid for suspicion, no matter how unfounded or unjustified it may be, and that failure to concur in what the judge may consider an adequate settlement may result in the imposition, upon a litigant or his counsel, of some retributive sanction or the incurrence of judicial displeasure." Id., 614–15.

Once a judge has become involved in settlement discussions, the proper procedure is for the judge to disqualify himself from the remainder of the case. Id., 615. General Statutes § 51-39 (c), however, provides that "[w]hen any judge is disqualified to act in any proceeding before him, he may act if the parties thereto consent in open court." Therefore, as a general rule, our courts will not review a claim of judicial bias on appeal unless that claim was properly presented to the trial court by means of a motion for disqualification or a motion for mistrial. *Krattenstein* v. *G. Fox & Co.*, supra, 616; *Cameron* v. *Cameron*, 187 Conn. 163, 168, 444 A.2d 915 (1982). In this case, however, we find it necessary to review the plaintiff's claim of judicial bias despite the fact that no motion was made during trial.

We review the claim of bias in this case because it is the plaintiff's contention that the court manifested its bias not only in its judgment, but also in the very words it used in its memorandum of decision. This claim was properly presented to the trial court in the plaintiff's motion for new trial.

In its memorandum of decision, the court noted: "The court is cognizant of the parties' negotiations to achieve an equitable division of the assets, thereby to avoid what may be described in retrospect as a bitterly contested dissolution hearing. During his testimony, the defendant repeated his willingness to abide by his earlier settlement proposal. Whatever her reason, the plaintiff, perhaps unwisely, chose not to accept the offer of compromise." The plaintiff contends that this language clearly demonstrated the court's bias.

With regard to the in-chambers conference, we have no way of knowing exactly what was discussed. The plaintiff asserts that during the conference the court exhibited hostility towards the plaintiff. The court, however, denies that such hostility existed. The plaintiff has not met her burden of establishing a record about whether there has been any impropriety. *State v. Fullwood,* 194 Conn. 573, 581, 484 A.2d 435 (1984).

We find, further, that the plaintiff's claim of judicial bias is not supported by the words used in the memorandum of decision. The words used indicate that the court was aware of negotiations to settle the case, and that the defendant was willing to abide by them. They do not indicate that the court knew of the content of the negotiations or that, if it did, that awareness was a factor in its determination of the case.

## II

The second issue raised on appeal is that the trial court erred in finding that the plaintiff bore a greater percentage of fault for the breakdown of the marriage than did the defendant and in dividing the marital assets in accordance with that finding. We find no error.

One of the several factors that must be considered by the court in fixing the financial awards in a dissolu-

tion case is the cause of the dissolution. General Statutes §§ 46b-81 (c) and 46b-82. In determining the cause of the breakdown of the marriage, the trial court is given great discretion to weigh and interpret the evidence before it and to pass upon the credibility of witnesses. *Figlar* v. *Figlar,* 174 Conn. 151, 153, 384 A.2d 1 (1978). Our review of the trial court's determination as to the cause of the breakdown of the marriage is limited to questions of whether the court correctly applied the law and could reasonably have concluded as it did. We do not retry the facts. *Mailly* v. *Mailly,* 13 Conn. App. 185, 188–89, 535 A.2d 385 (1988); *Palazzo* v. *Palazzo,* 9 Conn. App. 486, 488, 519 A.2d 1230 (1987).

In assigning to the plaintiff a greater percentage of fault for the breakdown of the marriage than to the defendant, the trial court was clearly making a finding as to the cause of the breakdown of the marriage. In making that finding, the court clearly gave greater weight to the evidence produced by the defendant than that produced by the plaintiff. The evidence produced by the defendant indicated that since the death of the parties' child in 1979 the plaintiff had become increasingly hostile to both him and their remaining children. The evidence also indicated that the plaintiff had begun drinking more heavily after the child's death and had begun frequenting drinking establishments. The defendant testified that the plaintiff had become involved in a relationship with another man and had voluntarily left the parties' home in January, 1985. Given this evidence, we cannot say that the trial court abused its discretion in finding that the actions of the plaintiff were more responsible for the breakdown of the marriage than the actions of the defendant.

III

The plaintiff's third claim of error is that the trial court erred in ordering her to transfer to the defend-

ant her interest in the marital residence. She claims that the court's award was an invalid order to provide child support to the parties' eighteen year old son and not a valid transfer of marital property to the defendant. We disagree.

In ordering the wife to transfer to the defendant her interest in the marital residence, the trial court used the following words: "In order to assure the defendant's continued residency along with his son and to effectuate an orderly sale of the premises should the defendant so choose, the plaintiff is ordered to transfer to the defendant forthwith her interest in the hereinbefore described real estate and improvements." We note, however, that the court also ordered the defendant to pay the plaintiff lump sum alimony in the amount of $35,000, such amount to be due and payable two years after the rendition of judgment or upon the sale of the house, whichever came first.

As we have noted before, "[w]e must read the language of a trial court in the context of its entire memorandum of decision, declining to find reversible error solely because of what may be an inappropriate choice of words. *Coe-Park Donuts, Inc.* v. *Robertshaw Controls Co.,* 1 Conn. App. 84, 87–89, 468 A.2d 292 (1983). We apply this principle to the trial court's memorandum of decision in this case." *Fisher* v. *Fisher,* 4 Conn. App. 97, 100, 492 A.2d 525 (1985). We conclude that, reading its language fairly and in the context of the entire memorandum of decision, the court did not enter an order to provide child support. The language of the trial court, while not free of ambiguity, is susceptible of a reading that the court intended the transfer of the marital residence to be an award to the defendant.[1] This

---

[1] We further note that the plaintiff never sought clarification of the court's memorandum of decision by means of a motion for articulation. See Practice Book § 4051. Had such a motion been filed, the court could have clari-

reading is supported by our reading of the record. Given the facts of this case, the trial court, in exercising its discretion, could reasonably have concluded that such an award was appropriate. *Papageorge* v. *Papageorge,* 12 Conn. App. 596, 599–600, 533 A.2d 229 (1987).

## IV

The plaintiff finally claims that the trial court erred in finding (1) that the value of the marital residence was only $75,000, (2) that a particular annuity fund was created solely by the defendant's employment earnings, and (3) that the defendant had a weekly income of only $350.[2]

" ' "The well settled standard of review in domestic relations cases is that this court will not disturb trial court orders unless the trial court has abused its legal discretion or its findings have no reasonable basis in the facts. *Gallo* v. *Gallo,* 184 Conn. 36, 50, 440 A.2d 782 (1981)." *McGuinness* v. *McGuinness,* 185 Conn. 7, 13, 440 A.2d 804 (1981). "As has often been explained, the foundation for this standard is that the trial court is in a clearly advantageous position to assess the personal factors significant to a domestic relations case, such as demeanor and attitude of the parties at the hearing. . . ." ' *McPhee* v. *McPhee,* 186 Conn. 167, 177, 440 A.2d 274 (1982)." (Citations omitted.) *Ehrenkranz* v. *Ehrenkranz,* 2 Conn. App. 416, 420, 479 A.2d 826 (1984).

With regard to the valuation of the marital residence, we hold that the trial court's finding was solidly based on the evidence produced at trial. The defendant testi-

---

fied what the award was intended to be. Absent such a motion, however, we are limited to reviewing the record in an attempt to determine what the court intended.

[2] The plaintiff also claims that the trial court erred in considering certain debts owed by the defendant to his mother. After affording this claim the appropriate scope of review, we find it to be completely without merit.

fied that the fair market value of the home was $75,000. The court was entitled to accept this testimony, especially in light of the fact that the only evidence produced by the plaintiff as to the value of the home was the testimony of an expert who did not know how many rooms the house had. As we have said before, "[d]etermination of the value of the properties is a matter properly left up to the trial court. . . . The trier may accept or reject the testimony of an expert, offered by one party or the other, in whole or in part. . . . 'It is the sole province of the trial court to weigh and interpret the evidence before it and to pass upon the credibility of witnesses.' *Smith* v. *Smith,* 185 Conn. 491, 493, 441 A.2d 140 (1981) . . . . We will not retry the facts." (Citations omitted.) *Ferrucci* v. *Ferrucci,* 11 Conn. App. 369, 373–74, 527 A.2d 1027, cert. denied, 205 Conn. 805, 531 A.2d 935 (1987).

The plaintiff next challenges the trial court's finding that a particular annuity fund was created solely from the defendant's employment earnings. She claims that there was no evidence to support the court's findings. We disagree.

The defendant filed a financial affidavit with the court in which he acknowledged the existence of the asset in dispute. In that affidavit, the defendant indicated that the asset was derived from "proceeds from business." In addition, the defendant denied at trial the plaintiff's contention that the annuity was created from the proceeds from the sale of jointly owned property. A judgment rendered will not be reversed unless a conclusion has been reached, or an inference drawn, from a fact, many facts, or the facts found, which affects the judgment rendered in material degree and is legally or logically inconsistent with that or those facts, or is so illogical or unsound, or so violative of the plain rules of reason, as to be unwarranted in law. *Edens* v. *Kole Construction Co.,* 188 Conn. 489, 497–98, 450 A.2d

1161 (1982); *Goold* v. *Goold,* 11 Conn. App. 268, 284, 527 A.2d 696, cert. denied, 204 Conn. 810, 528 A.2d 1156 (1987). On the basis of the record before us, we cannot say that the conclusion reached by the trial court was not reasonable and logical.

The plaintiff's final claim is that the court erred in finding that the defendant's net weekly income was $350. In finding the defendant's net weekly income, the court clearly relied on the defendant's financial affidavit. In that affidavit, the defendant indicated that his weekly gross income was $718. He claimed deductions for taxes, group life insurance, medical insurance, an IRA account and a profit sharing plan. The plaintiff asserts that the payments to the profit sharing plan and the IRA should not have been excluded from the defendant's net income. We agree.

General Statutes §§ 46b-81 and 46b-82 require the court to consider, inter alia, the amount and sources of income of the parties when making an award of alimony or a property assignment in a dissolution action. "The available net income, however, rather than gross income is the criterion for the establishment of an appropriate figure for periodic alimony. *Collette* v. *Collette,* 177 Conn. 465, 469, 418 A.2d 891 (1979)." *Bronson* v. *Bronson,* 1 Conn. App. 337, 340, 471 A.2d 977 (1984). In general accounting practice, net income would ordinarily consist of total income received by a party from all sources, less the legitimate expenses of realizing it. *Sturtevant* v. *Sturtevant,* 146 Conn. 644, 648, 153 A.2d 828 (1959). For the purposes of General Statutes §§ 46b-81 and 46b-82, however, we hold that net earned income for a wage earner is the gross amount of salary, wages or commissions, less all deductions by the employer for obligatory statutory or contractual obligations of the employee. Withholding of income taxes, FICA, and wage garnishment are examples of deductions required by law. Union dues, insurance premiums

and some deductions for pension plans are examples of deductions authorized by contract. Optional deductions, such as for IRAs, profit sharing plans, stock purchases, and credit union deposits are not proper deductions for a determination of net earned income for alimony or other financial orders. The latter deductions are optional and inure to the benefit of the employee. They are basically within the control of the employee and would allow him to establish the amount of his own net income were he allowed to deduct them from gross income.

In the case under consideration, therefore, the court's finding that the defendant's net earnings were approximately $350 per week is in error. To that amount, the court should have added the IRA deduction and the profit sharing deduction, thereby increasing net earnings of the defendant to approximately $500 per week, an increase of approximately 46 percent.

There is error in part, the judgment of the trial court is set aside with respect to its order of periodic alimony only and the case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.