## ELIZABETH CRISCUOLO *v.* MAURO MOTORS, INC.
### (AC 18924)

Landau, Spear and Healey, Js.

Argued February 29—officially released July 4, 2000

538

*Anita Flannigan Steenson,* with whom, on the brief, was *R. E. Phillips,* for the appellant (defendant).

*Frank S. Marcucci,* with whom, on the brief, was *Paul J. Dorsi,* for the appellee (plaintiff).

*Opinion*

HEALEY, J. The defendant, Mauro Motors, Inc., appeals from the judgment rendered in favor of the plaintiff, Elizabeth Criscuolo, after a trial to the court in this action pertaining to her purchase from the defendant of an allegedly defective used 1992 BMW (vehicle). The plaintiff filed a six count complaint[1] seeking, inter alia, damages,[2] attorney's fees and interest. The court

---

[1] The first count of the complaint alleged that the vehicle was not in good and running condition in that it had substantial mechanical defects. The second count alleged that the defendant breached the parties' sales agreement by representing that the vehicle had not previously been in an automobile accident when it had been in such an accident. The third count alleged a violation of General Statutes § 42-225 by virtue of false, misleading or deceptive statements about the history and condition of the vehicle. The fourth count alleged that the plaintiff relied to her detriment on the representations of the defendant. The fifth count alleged that the defendant fraudulently induced the plaintiff to purchase the vehicle. The sixth count alleged unfair or deceptive acts or practices in violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq.

[2] The defendant seemed to suggest at oral argument, but not in its brief, that the plaintiff in her complaint had not included a proper prayer for relief. We disagree. "In an ordinary civil case, the general rule is that a prayer for relief must articulate with specificity the form of relief sought." *Stern* v. *Medical Examining Board,* 208 Conn. 492, 501, 545 A.2d 1080 (1988), and

found the defendant liable only on the first count[3] and awarded the plaintiff damages of $10,883.14.[4] On appeal, the defendant claims that the court improperly (1) rendered judgment pursuant to a statutory cause of action that the plaintiff did not plead in her complaint or pursue at trial, but only was "imported" into the case by the court in its memorandum of decision, (2) decided that the defendant breached the implied warranty of merchantability pursuant to General Statutes § 42-2-314[5] in that the vehicle became unfit for its ordinary purpose due to a latent defect that became apparent only after being driven approximately 6500 miles in a one year period, (3) awarded only nominal damages after finding that the defendant was entitled to an offset for the plaintiff's use of the vehicle because calculation

cases therein cited. The plaintiff has done so in asking for "[m]onetary damages within the jurisdiction of the court."

[3] The court dismissed the remaining counts of the complaint, finding that the plaintiff had failed to meet her burden of proof as to the second, third, fifth and sixth counts, and that she had failed to state a cause of action in the fourth count.

[4] The court broke down its judgment for damages as follows: (1) down payment at the time of purchase, $4690.94; (2) eleven monthly payments at $538.70 per month for a total of $5925.70; (3) the cost of two new tires, as estimated by the defendant's witness, $240; and (4) an inspection by a tire dealer costing $26.50 for total damages of $10,883.14, less an offset for the plaintiff's use of the vehicle.

[5] General Statutes § 42a-2-314 provides: "(1) Unless excluded or modified as provided by section 42a-2-316, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

"(2) Goods to be merchantable must be at least such as (a) pass without objection in the trade under the contract description; and (b) in the case of fungible goods, are of fair average quality within the description; and (c) are fit for the ordinary purposes for which such goods are used; and (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and (e) are adequately contained, packaged, and labeled as the agreement may require; and (f) conform to the promises or affirmations of fact made on the container or label if any.

"(3) Unless excluded or modified as provided by section 42a-2-316 other implied warranties may arise from course of dealing or usage of trade."

of the offset was too speculative and (4) awarded the plaintiff an amount greater than she had paid as a return of her down payment. We affirm in part and reverse in part the judgment of the trial court.

In its memorandum of decision, the court set forth the following facts. On or about July 13, 1994, the plaintiff entered into a written, retail purchase and sale agreement with the defendant, an automobile dealer, whereby she agreed to buy and the defendant agreed to sell, a used 1992 BMW automobile. Although the agreed cash price was $23,000, the total cash price on delivery, after adjustments, was $24,690.94. The plaintiff allegedly made a down payment of $4690.94 and financed the balance. She took delivery of the vehicle on or about July 16, 1994, when its odometer read 10,120 miles.

From July, 1994, until November, 1994, the plaintiff used the vehicle on weekends. From November, 1994, to February, 1995, the plaintiff kept the vehicle garaged and no one drove it. By March, 1995, the odometer read 14,197 miles. In April, 1995, the plaintiff's husband began to use the vehicle regularly to drive back and forth to work. In June, 1995, the husband noticed what appeared to be severe wear on the tires. As of June 7, 1995, the odometer read 16,613 miles, which was 6500 miles more than when the plaintiff purchased the vehicle. The plaintiff's husband continued to drive the vehicle until September, 1995, when he and the plaintiff ceased using it. By September, 1995, the odometer read approximately 21,000 miles. Thus, from the time of purchase in July, 1994, until September, 1995, the plaintiff's use of the vehicle totaled approximately 11,000 miles.

In June, 1995, the plaintiff, having been apprised of the tire wear problem, undertook certain measures to learn why the problem arose and how it could be corrected. On or about June 7, 1995, the plaintiff's husband

took the vehicle to Guilford Tire Service (Guilford) for wheel alignment. After inspection, Guilford reported that it could not align the wheels properly. A handwritten notation on the Guilford report sheet stated, "three cracks in valence under bumper they tried to weld." From June, 1995, to July, 1995, the plaintiff contacted the defendant and complained about the alignment problem. Two appointments were made for the plaintiff to bring the vehicle in for inspection, but the plaintiff ultimately decided not to let the defendant inspect the vehicle. On June 16, 1995, the plaintiff, using the name Deborah Dowling, engaged County Line BMW of Watertown to perform an inspection. The inspection confirmed that the vehicle had been in a collision and disclosed other problems.[6] The plaintiff subsequently ascertained that her vehicle had been damaged in a collision in November, 1993, and that the damage was extensive, including considerable damage to the right front and rear of the vehicle.[7]

In July, 1995, the plaintiff stopped making her monthly payments on the vehicle. She also retained an attorney, who contacted the defendant in June, 1995.[8] On or about April 5, 1996, the plaintiff had Midway Service, Inc., of North Branford inspect the vehicle and prepare a repair estimate. Midway Service, Inc., esti-

---

[6] The inspection report by County Line BMW of Watertown stated in part: "[The vehicle has] been in a severe rear collision. Right rear drive axle, complete control arm have been replaced. Rear differential support frame is twisted on right side and should have been replaced. Right rear frame rail is dented. Rear bumper does not line up. . . . Three tires in fair shape, but right rear is bald. Because of bent differential support on right rear, the tire is scuffing the rubber off and will continue even if tire is replaced."

[7] The insurer of the vehicle at that time obtained a repair estimate in the range of $8000. The vehicle then was repaired. The owner at that time transferred the vehicle's title to Stamford European Motors, Inc., which, in turn, transferred the title to Chip's Auto Sales, Inc., which then transferred the title to the defendant on or about April 6, 1994.

[8] Sometime around July, 1995, the plaintiff mailed a complaint to the department of motor vehicles but obtained no satisfaction.

mated a total of $9350.78 to restore the vehicle to the condition it was in before it was involved in the accident. On May 14, 1996, the plaintiff filed her complaint.

In finding liability for the plaintiff on the first count, the court specifically found the following facts. "At the time of sale the subject BMW was defective in that its frame had been damaged in a prior collision so as to cause the right rear tire and wheel to be misaligned; that such a misalignment could not be corrected other than by straightening said frame to a condition permitting proper alignment of said tire and wheel. . . . The said defect affected the use of said vehicle in that it caused inordinate wear and tear on said tire. . . . The said defect affected the safety of said vehicle in that it affected negatively the handling of said vehicle when operated in wet or slippery conditions. . . . Said defect was not readily apparent by visual inspection at the time of sale. . . . Such defect would not be readily apparent as a result of the 'safety inspection' conducted by the defendant at the time of sale. . . . The defendant, its officers, agents and employees were unaware of the existence of said defect at the time of sale and unaware that the subject BMW had suffered damage in a collision prior to sale. . . . The plaintiff was aware of her right to have conducted an independent inspection of said vehicle, pursuant to General Statutes § 42-225 and she declined to do so." The court found, however, that the failure by the plaintiff to exercise such right of inspection did not constitute an exclusion of the implied warranty under General Statutes § 42a-2-316 (3) (b)[9] because there was no assurance that a reasonable inspection under the circumstances at the time of sale would have uncovered the defect.

_____

[9] The court's memorandum of decision references General Statutes § 42a-2-315 (3) (b), but because there is no subsection (3) (b) in that statute, it is reasonable for us to assume that the court intended to cite § 42a-2-316 (3) (b).

The court further found that "[b]ased on the testimony and evidence presented . . . the plaintiff has established, by a fair preponderance of the evidence, a breach of implied warranty of merchantability by the defendant in that over time the said defect rendered the subject motor vehicle unfit for the ordinary purposes for which such vehicle is used." The court then rendered judgment for the plaintiff on the first count of her complaint for $10,883.14, less an offset for her use of the vehicle.[10] The defendant thereafter appealed. Additional facts will be stated where necessary.

We begin by addressing the appropriate standard of review. "On appeal, it is the function of this court to determine whether the decision of the trial court is clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. That is the standard and scope of this court's judicial review of decisions of the trial court." *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

I

The defendant's first claim is that the court improperly rendered judgment on a statutory cause of action that the plaintiff did not plead in her complaint or pursue at trial, but that the court instead "imported" into

---

[10] The court scheduled a hearing for September 29, 1998, to admit evidence as to the monetary value of the offset.

the case in its memorandum of decision.[11] We do not agree.

"Pleadings have their place in our system of jurisprudence. While they are not held to the strict and artificial standard that once prevailed, we still cling to the belief, even in these iconoclastic days, that no orderly administration of justice is possible without them." *Malone* v. *Steinberg*, 138 Conn. 718, 721, 89 A.2d 213 (1952); *KMK Insulation, Inc.* v. *A. Prete & Son Construction Co.*, 49 Conn. App. 522, 525, 715 A.2d 799 (1998).

"The purpose of the complaint is to limit the issues to be decided at the trial of a case and is calculated to prevent surprise. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations in his complaint. . . . A plaintiff may not allege

---

[11] The first count of the complaint alleged:

"1. At all times hereinafter mentioned, the Defendant, MAURO MOTORS, INC., is a valid Connecticut corporation with its principal place of business located at 1635 Dixwell Avenue, in the Town of Hamden, County of New Haven and State of Connecticut, and is engaged in the business of, inter alia, the sale of new and used motor vehicles, and also being duly licensed by the State of Connecticut, Department of Motor Vehicles, Dealers and Repairers Division.

"2. On or about July 13, 1994, the Plaintiff, ELIZABETH CRISCUOLO, and the Defendant, entered into a written Retail Purchase Order for Motor Vehicle, whereby the Plaintiff agreed to buy, and the Defendant agreed to sell, a used 1992 BMW 318; C motor vehicle, for the price of Twenty-Three Thousand Dollars ($23,000.00).

"3. The Defendant warranted the motor vehicle to be in all respects in good and running condition and without any substantial mechanical defects, and the Plaintiff purchased said motor vehicle in reliance upon said warranties.

"4. The motor vehicle was not in fact in good and running condition and was not without substantial mechanical defect in that the frame of said motor vehicle is bent and twisted, the right rear frame rail is dented, the rear bumper does not line up, the paint work and body work is substandard, and the tires are rubbing against the vehicle.

"5. By reason of said defects, the Plaintiff has been damaged in that said motor vehicle is inoperable and will require a large sum of money for its repair and during the period of time it will take to repair, the Plaintiff will lose its use and enjoyment."

one cause of action and recover on another. Facts found but not averred cannot be made the basis for a recovery." (Citations omitted; internal quotation marks omitted.) *Moore* v. *Sergi*, 38 Conn. App. 829, 841–42, 664 A.2d 795 (1995); *Francis* v. *Hollauer*, 1 Conn. App. 693, 694–95, 475 A.2d 326 (1984).

Pursuant to Practice Book § 10-3 (a), "When any claim made in a complaint, cross complaint, special defense, or other pleading is grounded on a statute, the statute shall be specifically identified by its number." The defendant claims that the judgment on the first count was inappropriate in that it was awarded pursuant to statutory authority and there is no allegation of any statutory basis in the first count. Although the defendant's claim is correct, our courts have held that the requirement that the pleader specifically identify the statute on which he relies is directory rather than mandatory. *Steele* v. *Stonington*, 225 Conn. 217, 221 n.7, 622 A.2d 551 (1993); *Goodrich* v. *Diodato*, 48 Conn. App. 436, 443, 710 A.2d 818 (1998); *Peerless Ins. Co.* v. *Tucciarone*, 48 Conn. App. 160, 163 n.3, 708 A.2d 611 (1998); *Rowe* v. *Godou*, 12 Conn. App. 538, 542, 532 A.2d 978 (1987), rev'd on other grounds, 209 Conn. 273, 520 A.2d 1073 (1988).

"The warranty of merchantability is the broadest and most important warranty in the Uniform Commercial Code. A warranty of merchantability is implied in any sale of goods by a merchant seller; the statutory standards for merchantability include, under § 42a-2-314 (2) (c), that the goods be fit for the ordinary purposes for which such goods are used. . . . See White & Summers, Handbook of the Law under the Uniform Commercial Code, §§ 9-6, 9-7 (1972)." (Internal quotation marks omitted.) *Schenck* v. *Pelkey*, 176 Conn. 245, 253–54, 405 A.2d 665 (1978).

"The implied warranty of merchantability holds merchants liable to the extent their goods fail to conform

to the ordinary purpose for which they are supposed to be used.[12] U.C.C. § 2-314. A breach of this warranty occurs, if at all, at the time of the sale; *Standard Structural Steel Co.* v. *Bethlehem Steel Corp.*, 597 F. Supp. 164, 187 (D. Conn. 1984); *Liberty Mut. Ins. Co.* v. *Sears, Roebuck & Co.*, 35 Conn. Supp. 687, 690, 406 A.2d 1254, 1257 (1979), or when they leave the manufacturer's control. *Fellows* v. *USV Pharmaceutical Corp.*, 502 F. Supp. 297, 299 (D. Md. 1980). Thus, the critical question with regard to this warranty is what was the ordinary purpose for which the goods were to be used and were the goods suited for that purpose when they left [the defendant's] control. This is properly a question for the jury. See generally *Lindy Homes, Inc.* v. *Evans Supply Co.*, 357 So. 2d 996 (Ala. Civ. App. 1978); *Agri-Business Supply Co.* v. *Hodge*, 447 So. 2d 769 (Ala. Civ. App. 1984); *Price Bros. Co.* v. *Philadelphia Gear Corp.*, 649 F. 2d 416 (6th Cir.), cert. denied, 454 U.S. 1099, 102 S. Ct. 674, 70 L. Ed. 2d 641 (1981)." *Moldex, Inc.* v. *Ogden Engineering Corp.*, 652 F. Sup. 584, 590 (D. Conn. 1987).

It is apparent from an examination of the first count of the plaintiff's complaint that she alleged a cause of action in breach of warranty. The plaintiff alleged that "[t]he Defendant warranted the motor vehicle to be in all respects in good and running condition and without any substantial mechanical defects and the Plaintiff purchased [this] motor vehicle in reliance upon said warranties." The plaintiff also alleged that "[t]he motor vehicle was not in fact in good and running condition and was not without substantial mechanical defect . . . ." The language of the first count not only alleged that there was a breach of warranty, but it also included language that sounded in terms of merchantability under § 42a-2-314 (2) (c). Other than the inadvertence

---

[12] There is no question in this case that the defendant was a merchant seller and that the vehicle was sold as being fit for the ordinary purposes for which such goods are used. See General Statutes § 42a-2-314 (2) (c).

of not citing the specific statute in the first count, the plaintiff's allegations are amenable to alleging a cause of action on the basis of a breach of the implied warranty of merchantability. Because this was the only complaint in the case, if the defendant in preparing for trial had any question about whether the plaintiff sought to plead a cause of action on the basis of a statute, it had, among other options, the right to file a request to revise to elicit that information. See Practice Book § 10-35; *Rowe* v. *Godou*, 209 Conn. 273, 279, 550 A.2d 1073 (1988). The defendant cannot genuinely claim that it was surprised. The claim by the defendant that the plaintiff did not pursue the matter regarding breach of an implied warranty of merchantability lacks merit. On the basis of the whole record before us,[13] including the court's findings of fact and conclusions of law, we conclude that this matter was pursued at trial. The court did not, as the defendant claims, "import" this statutory cause of action into the case; it was already there.[14] In accordance with what we have stated, we conclude that the plaintiff properly alleged this cause of action and,

---

[13] The transcript of the entire trial is not in the record before us.

[14] The defendant claims that the plaintiff cannot recover for breach of warranty on the basis of *Sampiere* v. *Zaretsky*, 26 Conn. App. 490, 602 A.2d 1037, cert. denied, 222 Conn. 902, 606 A.2d 1328 (1992). We do not agree. *Sampiere* presents a scenario much different from the one in this case. In *Sampiere*, a medical malpractice case, the plaintiff failed to allege in her complaint that she would be forced, as a result of the claimed malpractice, to incur *future* medical expenses. Id., 492. The trial court, however, instructed the jury that it could award such expenses. Id. On appeal, this court reversed the judgment for the plaintiff on the basis of that improper instruction and stated that the allegations in her complaint "explicitly limited her right of recovery to those expenses incurred prior to the trial." Id., 496. We also stated that "[e]ven a broad reading of the complaint did not give the defendant notice of the additional issue." Id.

In the present case, the plaintiff's allegations did not explicitly limit her right to recover under the theory of implied warranty of merchantability. Furthermore, if we read the complaint broadly, it would, without question, be said to have given the defendant notice of the specific claim. *Sampiere* is thus clearly distinguishable.

further, that it was an element of the case pursued at the time of trial.

## II

The defendant's second claim is that the court improperly decided that it breached an implied warranty of merchantability in that the vehicle became unfit for its ordinary purpose due to a latent defect that became apparent only after being driven approximately 6500 miles between July, 1994, and June, 1995. We do not agree.

In its brief, the defendant attacked the court's memorandum of decision, stating: "In its memorandum of decision the trial court cited *Beech Aircraft Corp.* v. *Flexible Tubing Corp.*, 270 F. Sup. 548 (D. Conn. 1967), for the proposition that '[i]f the particular purpose for which goods are to be used coincides with their general functional use, an implied warranty of fitness for a particular purpose merges with an implied warranty of merchantability,' [Id., 562], citing *Crotty* v. *Shartenberg's-New Haven, Inc.*, 147 Conn. 460, 464, 162 A.2d 513 (1960). Recovery may be on either theory: The particular purpose for which the goods are required, made known to the seller, may also be the general purpose for which the product was prepared and is commonly used. If so, there is an implied warranty that the goods are of merchantable quality. 'A dealer who sells articles which ordinarily are used in only one way impliedly warrants fitness for use in that particular way. The warranty is one of merchantability.' Id. Of significance in [*Beech Aircraft Corp.* v. *Flexible Tubing Corp.*, supra, 548], however, the product in question, rubber hoses, had more than one commercial purpose. In the instant case, the subject BMW had only one purpose, its ordinary purpose—transportation of the owner. Therefore, the trial court misapplied the holding in [*Beech Aircraft*

*Corp.*] to the facts of the instant case by failing to distinguish the significant factual differences."[15]

The court did not apply, let alone misapply, the holding of *Beech Aircraft Corp.*, as the defendant claims. *Beech Aircraft Corp.* was a complex case[16] in which the plaintiff buyer sought recission of a sale of special rubber hoses on the ground that the seller had breached its warranty. Id., 556. As both parties in that case were aware, the hoses that the seller manufactured were purchased for the purpose of transporting "extremely toxic and corrosive" substances; id., 552; that were to be used in propellants for a liquid filled rocket.[17] Examining

[15] "We may examine the trial court's memorandum of decision to understand better the basis of its decision and to determine the reasoning used by it in reaching its conclusion." *Barra* v. *Ridgefield Card & Gift Gallery, Ltd.*, 194 Conn. 400, 404, 480 A.2d 552 (1984). "[W]e must read the language of [the] trial court in the context of its entire memorandum of decision, declining to find reversible error solely because of what may be an inappropriate choice of words." (Internal quotation marks omitted.) *Sunbury* v. *Sunbury*, 13 Conn. App. 651, 658, 538 A.2d 1082 (1988), rev'd on other grounds, 210 Conn. 170, 553 A.2d 612 (1989). It is the duty of the trial judge to set forth the basis of his or her decision. *Powers* v. *Powers*, 183 Conn. 124, 125, 438 A.2d 845 (1981).

[16] *Beech Aircraft Corp.* v. *Flexible Tubing Corp.*, supra, 270 F. Sup. 548, was complex factually and legally. The decision included forty-four headnotes. Although both Connecticut and Colorado law were involved, it was agreed that the pertinent statutory warranty provisions were the same.

[17] The holding of *Beech Aircraft Corp.*, for the sake of brevity without the loss of substance, fairly appears in the syllabus of the case, which states: "Suit for breach of warranty, wherein plaintiff sought recission of sale of specialized hoses on ground of seller's breach and defendant counterclaimed. The [United States District Court for the District of Connecticut], Blumenfeld, J., held that where attached to quotations submitted by seller's agent was a drawing showing use of hoses to transport corrosive fuel and oxidizer, note on drawing stated that rubber compound and teflon used would be compatible, and seller's sales order acknowledgement, constituting a counteroffer to sell hoses, contained no representations but stated that seller guaranteed its merchandise to be substantially as represented, *seller expressly warranted* that hoses would be reasonably fit for use with corrosive substances referred to in drawing and buyer was not liable for purchase price when hoses failed to fulfill warranty, but that where buyer could have procured substitute hoses within a matter of hours or at most a few weeks when it appeared that hoses supplied by seller were not suitable for buyer's

*Beech Aircraft Corp.* in its entirety and considering that portion of it paraphrased in the trial court's memorandum of decision, *Beech Aircraft Corp.* followed Connecticut law and made no new law with its language,[18] as it could not. Interestingly, in holding for the plaintiff, the court in *Beech Aircraft Corp.* based its decision on the ground that the defendant had breached its express warranty made to the plaintiff and not on the ground that it had breached any implied warranty. The court in the present case, therefore, did not misapply or even apply the holding in *Beech Aircraft Corp.* Rather, it iterated what for many years has been Connecticut case law.

The defendant is correct in stating in its brief that there are "significant factual differences" between *Beech Aircraft Corp.* and this case. Hence, in paraphrasing language from *Beech Aircraft Corp.*, the court was not applying the holding of that decision, but merely was referring to Connecticut law that set out the theories of implied warranty as well as express warranty.[19] There was, therefore, no need to go into the factual differences between *Beech Aircraft Corp.* and the present case.

purpose, buyer's use of some of hoses after giving notice of rescission to seller was not reasonably necessary to mitigate probable future damage and constituted waiver of buyer's right to rescind as to hoses actually used." (Emphasis added.) *Beech Aircraft Corp.* v. *Flexible Tubing Corp.*, supra, 548.

[18] In this case, the language in the memorandum of decision regarding implied warranties paraphrases that in *Crotty* v. *Shartenberg's-New Haven, Inc.*, supra, 147 Conn. 464.

[19] The defendant suggests that the court improperly relied on *Beech Aircraft Corp.* Simply put, had *Crotty* v. *Shartenberg's-New Haven, Inc.*, supra, 147 Conn. 460, itself been cited instead of *Beech Aircraft Corp.*, there well could have been no comment by the defendant. Assuming arguendo that the court did improperly rely on *Beech Aircraft Corp.*, the facts could not establish that the court improperly found for the plaintiff on the first count of her complaint because even where a court "does not state a proper basis for its results, its judgment may be sustained if there are proper grounds to support it." *Robert S. Weiss & Associates, Inc.* v. *Wiederlight*, 208 Conn. 525, 529, 546 A.2d 216 (1988).

In its brief, the defendant also argued that the court acted improperly in not following "the holding and reasoning of our Supreme Court[20] in *Chamberlain* v. *Bob Matick Chevrolet, Inc.*, [4 Conn. Cir. Ct. 685, 239 A.2d 42 (1967)], which is an analogous case, squarely on point."

In making this claim, the defendant argues that the court found the same factual scenario as the court described in *Chamberlain* and other similar cases,[21] but did not follow the principle of law set forth in *Chamberlain* when it decided that the defendant in the present case breached the implied warranty of merchantability. This case, however, is quite distinguishable from *Chamberlain*.

In *Chamberlain*, the plaintiff bought a used 1958 Chevrolet from the defendant.[22] Id., 687. The defendant's salesman, at the time of the sale, told the plaintiff that the car's master cylinder needed to be fixed. Id. Knowing this, the plaintiff still purchased the car. Id., 688. Shortly thereafter, the car developed an oil leak, and the plaintiff's son brought it to an oil dealer. Id. The oil dealer detected some worn and defective parts that required replacement for the safe operation of the car. Id., 689. This information was not communicated to the plaintiff, to her son or to the defendant until late in September, 1965. Id. On September 29, 1965, the plaintiff's husband wrote a letter to the defendant, claiming that the plaintiff was entitled to rescission because of the alleged breach of warranty as evidenced by the

---

[20] *Chamberlain* v. *Bob Matick Chevrolet, Inc.*, 4 Conn. Cir. Ct. 685, 239 A.2d 42 (1967), was decided by the Appellate Division of the Circuit Court, not by our Supreme Court.

[21] No "other similar cases" are cited by the defendant in its brief.

[22] The purchaser of this car bought it from the defendant for her son who was a student at a college in Schenectady, New York. *Chamberlain* v. *Bob Matick Chevrolet, Inc.*, supra, 4 Conn. Cir. Ct. 687. She purchased the car in 1965. Id. Her son picked up the car from the defendant late in August, 1965, and soon thereafter drove to Schenectady, where the vehicle was kept until it was sold one year later. Id., 688.

claimed defects. Id. The plaintiff's husband offered to return the car upon the return of the money paid. Id. The Appellate Division of the Circuit Court held that the evidence sustained the trial court's finding that the seller had not breached its "warranty of implied fitness"; id., 689; in the sale of the used vehicle. Id., 695–96.

The circumstances of *Chamberlain* are quite dissimilar from those of the present case. We agree with *Chamberlain*'s statement, however, that "[a] used car is not a new car, and the express or implied warranties, if any, must be reflected in the newness or antiquity of the car sold." Id., 695; see *Web Press Services Corp.* v. *New London Motors, Inc.*, 203 Conn. 342, 353, 525 A.2d 57 (1987). In *Chamberlain*, the car was a seven year old Chevrolet; *Chamberlain* v. *Bob Matick Chevrolet, Inc.*, supra, 4 Conn. Cir. Ct. 687; in this case, the vehicle was a two year old BMW. In *Chamberlain*, the purchase price was $325; id.; in this case, the purchase price was $24,690. Furthermore, in *Chamberlain*, the car was sold "as is," with no guarantees; id; in this case, the car was not sold "as is."[23]

Moreover, we have not overlooked the court's finding that the "defect would not be readily apparent as a result of the 'safety inspection' conducted by the defendant at the time of sale." In *Web Press Services Corp.* v. *New London Motors, Inc.*, supra, 203 Conn. 343–44, the plaintiff sought damages from the defendant automobile dealer in connection with the defendant's sale to the plaintiff of an allegedly defective used vehicle. The court interpreted *Chamberlain* to stand for the proposition that unless the case before the court concerns an "as is" clause in the contract, *Chamberlain* does not

---

[23] The *Chamberlain* court also stated that the defendant's salesman had explained to the plaintiff and her son that "no guarantee meant that once they drove the vehicle out of the lot, it became their responsibility." (Internal quotation marks omitted.) *Chamberlain* v. *Bob Matick Chevrolet, Inc.*, supra, 4 Conn. Cir. Ct. 687.

apply.[24] Id., 353. Therefore, any other source that interprets *Chamberlain* to stand for more than just that proposition is unpersuasive authority.[25] The court in *Web Press Services Corp.* never addressed the fact that in that case, the trial court concluded that there was "no evidence that [the defendant] knew or should have known that . . . there were defects in [the] vehicle . . . ." Id., 361. Because the court never addressed that fact when it discussed the implied warranty of merchantability, any suggestion that *Chamberlain*'s dictum is critical in our analysis lacks merit. Therefore, in the present case, the defendant's reliance on *Chamberlain* is misplaced. See id., 353.

We therefore cannot conclude that *Chamberlain* is squarely on point or that it involves the same factual scenario as exists in the present case. The court in the present case recognized that the facts found and the applicable law permitted the conclusion that the defendant breached the implied warranty of merchantability[26] in that the vehicle involved was unfit for the ordinary purposes for which it was used. We agree with that

---

[24] Because *Web Press Services Corp.* is a Supreme Court case and *Chamberlain* is a Circuit Court case, *Web Press Services Corp.* is more authoritative support.

[25] The *Chamberlain* "court stressed [that] there was no evidence that the dealer had any knowledge of the alleged defect prior to the sale, or that the defect was ascertainable by inspection." Annot., Liability on Implied Warranties in Sale of Used Motor Vehicle, 47 A.L.R.5th 677, 713 § 4[b] (1997).

[26] It was appropriate for the court to conclude that what the defendant characterizes in its brief as a "latent defect," which the defendant was responsible for under its warranty, was not discovered by the plaintiff apparently until after the vehicle had been driven about 6500 miles between July, 1994, when it was purchased, and June, 1995. This case has some similarity to *McCormack* v. *Lynn Imports, Inc.*, 114 Misc. 2d 905, 452 N.Y.S.2d 821 (1982). In *McCormack*, the plaintiff was involved in a minor collision eight months after she bought a used car from the defendant. Id., 907–908. The plaintiff's expert testified that he found that the car had a bent frame from an earlier accident and that there was evidence of weld marks. Id., 908. The small claims court found a breach of the implied warranty of merchantability under the Uniform Commercial Code. Id., 910–12.

basis of liability. The court weighed all of the factors and properly concluded that the defendant had breached its implied warranty of merchantability.

The law the defendant uses to support its claim that the court improperly found a breach of the implied warranty of merchantability is not in fact applicable. The cases the defendant cites clearly are distinguishable from the present case. The defendant, therefore, has not shown that the court's fact-finding was clearly erroneous or that its legal conclusions were improper.

III

The defendant's next claim is that the court improperly awarded only nominal damages after it found that the defendant was entitled to an offset for the plaintiff's use of the vehicle, but determined that calculating the amount of the offset was too speculative. We do not agree.

"The policy of the law is always to prevent unnecessary litigation, and where . . . entire justice can be done to both of the parties before the court, by the ascertainment and set-off[27] of their mutual claims against each other, without a violation of any of the settled rules or forms of law, such set-off ought always to be made. . . . A set-off is made where the defendant has a debt against the plaintiff . . . and desires to avail himself of that debt, in the existing suit, either to reduce the plaintiff's recovery, or to defeat it altogether, and, as the case may be, to recover a judgment in his own favor for a balance." (Citation omitted; internal quotation marks omitted.) *Hope's Architectural Products, Inc.* v. *Fox Steel Co.*, 44 Conn. App. 759, 762, 692 A.2d 829, cert. denied, 241 Conn. 915, 696 A.2d 985 (1997).

---

[27] The right of setoff also is called offset. *Citizens Bank of Maryland* v. *Strumpf*, 516 U.S. 16, 18, 116 S. Ct. 286, 133 L. Ed. 2d 258 (1995).

The court found that the plaintiff and her husband drove the vehicle approximately 11,000 miles between July, 1994, and September, 1995. It further found that the defendant established, by the necessary burden of proof, that it was entitled to an offset for that use. Therefore, after the court rendered judgment, it scheduled an evidentiary hearing for the limited purpose of establishing a monetary value for the use of the vehicle by the plaintiff and her husband.[28] A hearing thereafter was held at which the defendant presented two expert witnesses, Tom Neville and Gary Listorti, who were examined and cross-examined at length.

Neville and Listorti had considerable experience in the matter of leasing motor vehicles. Both were confronted with the task of calculating a monetary value for the plaintiff's monthly use in 1994 and 1995 of a 1992 vehicle.[29] Neville, the defendant's service director, offered figures on the basis of new motor vehicles. He testified that he was not aware of whether there was a market for leasing defective vehicles and had no opinion regarding the fair use of this particular vehicle in 1994 and 1995. Listorti, the rental manager for a large Ford car and truck agency for about nineteen years, had never leased a BMW and did not know what this model BMW had cost in 1994. Furthermore, Listorti was unaware that the vehicle was defective. He testified that if he knew that a vehicle was defective, he would not lease it because there is no market for leasing a defective motor vehicle.

Credibility of expert testimony is for the trier of fact, and such testimony cannot be based on conjecture or surmise. See *Connecticut Bank & Trust Co.* v. *Incendy*,

[28] The court scheduled the hearing because it concluded that the record was insufficient to enable it to determine the dollar amount to which the defendant was entitled.

[29] Each expert was hindered because neither had any lease figures from 1992 to work from.

207 Conn. 15, 33–34, 540 A.2d 32 (1988). We are aware that "[m]athematical exactitude in the proof of damages is often impossible, but [the party seeking damages] must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 59, 717 A.2d 77 (1998). "To authorize a recovery of more than nominal damages, facts must exist and be shown by the evidence which affords a reasonable basis for measuring the [defendant's] loss." (Internal quotation marks omitted.) Id., 58.

After listening to the experts, the court, in commenting on the difficulty of placing a correct monetary value on the vehicle's use under these circumstances, stated that the comparisons by the experts were based on "a different type of agreement [than what the plaintiff actually entered into], that is, a lease agreement as contrasted to the retail sale and purchase [agreement actually entered into] by the plaintiff . . . ." The court stated that it was difficult for the experts to calculate, in 1998, figures for a period of 1994 and 1995 on a vehicle that was built in 1992.[30] At the end of the hearing, the court stated that "based on the evidence presented, for the court to attempt to calculate a reasonable offset for the plaintiff's usage of the subject motor vehicle would require an exercise in guessing and speculation, which this court declines to do, and the court concludes that the defendant has failed to establish by a fair preponderance of the evidence more than a nominal value for the subject offset." The court then awarded a nomi-

[30] The court noted the many differences one must consider when making 1998 calculations for a period of 1994 and 1995. Some of the differences the court addressed were different manufacturer suggested retail prices, different total sales prices and different start payments. The court noted the fact that the vehicle in this case (1) was used, not new, and (2) was found to have been defective at the time of the sale and during its use by the plaintiff.

nal offset of $1 to the defendant and adjusted the plaintiff's actual damages accordingly. We conclude that under these circumstances, the court's award of nominal damages was appropriate and was not clearly erroneous.

## IV

The defendant's final claim is that the court improperly awarded the plaintiff, as a return of her down payment, an amount greater than what she had paid. We agree with the defendant.

The defendant argues that in its posttrial motion for reargument and reconsideration, it noted that the court had determined that the defendant was to refund the plaintiff's down payment. In that regard, the defendant points out that the court awarded $4690.94, but argues that the plaintiff's evidence, exhibits A[31] and B,[32] indicates that the amount of the down payment was $2980.94. The court issued no clarification in response to the defendant's motion.[33]

In its memorandum of decision, the court found that the plaintiff should be awarded $4690.94 to account for the down payment she had made. While it is true, as the plaintiff argues, that exhibit A sets out the down payment as $4690.94, the defendant argues that this figure is incorrect and that the actual down payment was $2980.94. The defendant points to two other exhibits, exhibit B and exhibit nine. The latter is the defen-

---

[31] Exhibit A was the retail installment contract, dated July 13, 1994, between the defendant as the seller and the plaintiff as the buyer.

[32] Exhibit B is the BMW Financial Services, Retail Installment Contract and Security Agreement, dated July 15, 1994, between the defendant as the seller and the plaintiff as the buyer. The plaintiff financed the balance by the agreement in exhibit B after being credited for the cash she put down.

[33] At the time of the hearing regarding the offset on September 29, 1998, the defendant drew the court's attention to the claimed discrepancy in the amount of the down payment. At that time, the court stated: "I understand. I propose to take no action, but it's on the record, your position on this matter."

dant's invoice, no. 1977, dated July 15, 1994, which recites a down payment of $2980.94.[34] Exhibit B is a document, dated July 15, 1994, and signed by the plaintiff, which recites the amount financed as $21,710.

Exhibit B also sets out the dollar amounts involved in arriving at the $21,710 figure. In section four, part B, of exhibit B, titled "Down Payment," there is typed the figure 2980.94, which is repeated on the line titled "Total Down Payment." In yet another box on exhibit B titled "Total Sale Price," $2980.94 appears as the down payment. Furthermore, when $2980.94 is added to the amount financed, $21,710, the total is $24,690.94, which is the total cash price of the vehicle.[35]

On exhibit A, the "Total Cash Price Delivered" is set out as $24,690.94, and the "Unpaid Balance of Cash Price" is set out as $20,000. Thus, on exhibit A, the retail installment contact signed by the plaintiff and the defendant, the figure $4690.94 appears. That figure appears once again on exhibit A on no special designated line and in no box, but on the face of the exhibit as "COD Amt $4,390.94." On exhibit B, the figure $2980.94 appears three times. As far as the down payment is concerned, the only evidence before us on this matter, in addition to what we previously have set out, is a check from the plaintiff's credit union, dated July 16, 1994, to the defendant in the amount of $2250, plus the $300 referred to in exhibit A.[36]

We do believe that it is fair to consider exhibits A and B together because the two are legally related, with the former being the transfer of the property and the latter being in the nature, metaphorically speaking, of

[34] Exhibit nine contains handwriting that reads, "COD amount paid-in-full-7-15-95 T.D." There are no handwritten signatures on it.

[35] Exhibit B also includes a specific dollar amount for such items as the monthly payments, the terms of the payments, the total of the payments, the annual percentage rate, the cash sale price and the sales tax.

[36] If there is any other evidence of the down payment, it is not before us.

the mortgage that completes the delivery of the consideration in full for the transaction.

In proceeding as we do, we are not retrying any facts. We are determining whether the challenged facts were appropriately determined. We may modify the amount of damages where it exceeds the amount proven. See *Sabo* v. *Strolis*, 148 Conn. 504, 506, 172 A.2d 609 (1961). We can do so especially where it can be done without interfering with settled principles of law, and the record contains sufficient data to accomplish that task. See 5 C.J.S. 404–405, Appeal and Error § 906 (1993).

We observe that on exhibit A, the "Total Cash Price Delivered" on the vehicle was $24,690.94 and on exhibit B in the box labeled "Amount Financed" is $21,710. The difference between those figures is $2980.94. This figure, we determine, is the proper amount that should have been awarded to the plaintiff as a refund of the down payment. The court was, therefore, clearly erroneous when it determined that the amount of her down payment award should have been $4690.94. When calculating damages in a breach of contract case, the plaintiff is entitled to receive that amount of compensation that would leave her as well off as she would have been had the breach of contract not taken place. See *Foley* v. *Huntington*, 42 Conn. App. 712, 722, 682 A.2d 1026, cert. denied, 239 Conn. 931, 683 A.2d 397 (1996). Awarding her $2980.94 for her down payment will do that on this branch of her claim.

The judgment is reversed only as to the calculation of the amount of the down payment due the plaintiff and the case is remanded with direction to reduce the refund of the down payment to $2980.94; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.